The final matter, No. 25-1201 Sanjay Krishna et al. v. Lori Chavez-DeRemer. At this time, would counsel for the appellants please introduce themselves on the record to begin? Good morning, Your Honor. This is Stephen Brown for the appellants, and I would like to reserve two minutes for rebuttal, if that's all right. Good morning, and if it may please the Court, just by way of quick background, in 2004 the Department of Labor created the PERM Labor Certification Process in order for employers going through the employment-based green card process to test the labor market to ensure that American workers are not being displaced. In 2004, when the Department of Labor created the most recent version of the PERM Labor Certification Process, the Department of Labor estimated that it would take 45 to 60 days to do these adjudications, and they estimated in the rulemaking that they estimated about 100,000 of these per year. Today, we're sitting at nearly 500 days for adjudication, nearly a ten times. Before we get to the merits, do you want to just address the mootness argument? Yes, Your Honor, absolutely. I kind of figured that's what you guys were going to be very interested in. On mootness, you know, it's our opinion here that this is a voluntary cessation matter. The delay by Department of Labor ceased during the pendency of the litigation. It's highly likely that the— Counsel, can I just follow up on that? Because, you know, normally the way the voluntary cessation doctrine works is just in a very practical sense. The argument is that the government here is taking the steps that it's taking specifically to moot the appeal in response to the litigation that's been filed. But I think here there's certainly an argument to be made that the granting of the authorizations was just in the ordinary course. They were just being processed during the time that the litigation was ongoing, and because the litigation has now lasted a couple of years, they finally got around to the three plaintiffs who you claim—who you didn't concede below the claims were already mooted by. So why is that a wrong way to look at it here? That it's not in response to the litigation that the processing was finally complete. It was just in the ordinary course, and therefore would the voluntary cessation doctrine apply at all? Yes, Your Honor. I appreciate the question. You know, I don't represent the government, so I don't know whether it was normal course or whether it was in response to litigation. However, that's up to the government to prove, and they don't provide any evidence of that in any of their briefing. I think, though, it may be a bit different, Counsel, because you're seeking to have the voluntary cessation exception essentially applied. And so in that sense, it would be, I believe, up to you to show that it does apply here. And so what reason do we have on this record to think that the processing was done in response to the litigation rather than in the ordinary course? Yes, Your Honor. Obviously, again, not having all the record from the government on what made their decisions, we have that these mooted out very quickly after filing the notice of appeal. I mean, it seems highly likely from the appellant's side of things that this was designed because there are numerous issues on the merits that would have undermined the case as it presented itself. Counsel, weren't these certifications obtained within the time period that is generally applicable to these applications? I know you're not happy with that time period, but as a factual matter, isn't that the case? I believe so, Your Honor. Would that not support an inference that this all transpired in sort of the ordinary course of events? It could, Your Honor, and if the court wants to go down that route, we can talk about a muntzinger vacater, and I understand that if that's what the court wants to do. Do you want to say a little bit about muntzinger vacater since we're on this topic? No, Your Honor, I think just on the merits of itself, just because this would moot out during the course of appeal, muntzinger would apply, Your Honor. Could you be clear, Counsel, what relief are you now seeking? Yes, Your Honor. I mean, is it all your clients have now gotten the certification that they sought? I guess this does go to the moot decision for sure. So what's left? Is it a declaratory judgment? It would be akin to that, Your Honor, just the idea that these delays are unreasonable, especially in light of the fact that the appellants are highly likely to go through this process again. Are you doing a recurring evading review exception? It would be. I mean, it would also go under the evading review, Your Honor. I mean, that is something that I do think is relevant in this case, considering that these delays have continued to increase while the demand has not increased. In fact, it decreased in fiscal year 2024, yet we're seeing an increase of processing times. And are you challenging the mootness ruling as to the three? There was a mootness finding below as to certain claims, correct? Yes, there were some that had received decisions before the district court had even ruled, Your Honor. And you didn't challenge that on the ground, that that doesn't moot it out, that it could recur? We figured with the three we had enough to raise the appeal, Your Honor. And you do argue that this fits within that exception? Yes, Your Honor. I think with evading review, Your Honor, yes, Your Honor, because, again, these are increasing delays, and I think a decision from the circuit could maybe rein in and provide left and right limits to the agency on what is reasonable or to the district court on how to interpret reasonableness in this context, Your Honor. What ground is there for us to conclude that these three particular plaintiffs who remain, that the issue would recur for them? Yes, Your Honor. So with immigration in the immigrant visa context, the green card context for the employment-based, there is a backlog for every nationality, especially though it is a higher backlog for those of Indian and Chinese nationality due to the availability of green cards and 7% caps on nationality. Any time the PERM labor certification is only for that particular job, Congress understood in the American Competitiveness and 21st Century Act, AC-21, that individuals are likely to get promoted, change jobs, whatever, allow for the portability. Any time we talk about a potential promotion, individuals in the immigrant community are concerned, how is that going to affect their green card process because they are likely to have to go through this process again. Same thing with changing jobs. They would have to go through this process again because they would have a new sponsor. So if there's a reasonable processing time and place, that's a less concern that would frustrate the portability ideals of AC-21. So just a practical question. So your argument is that even if you're working for the same employer doing a similar job, if your job title changes, that you would have to re-go through this process? Is that what you're saying? It would really depend, Your Honor. I don't think a job title necessarily, but if you get a promotion, I think you would. If you have new responsibilities that have new job requirements that would necessitate a new labor market test, I think you would have to do a new perm labor certification, Your Honor. Counsel, the way you describe perhaps the future need to go through this process, again, it sounds highly speculative. You're talking about things that might happen. To the extent you have to resort to that kind of speculation, doesn't that argue against the applicability of this capable of repetition doctrine? Your Honor, I think when we talk about the future harm here, there is a little bit of speculation. We don't have a magic eight ball, but when we talk about the practical side of employment-based immigration, it is highly likely and not unheard of that individuals go through this process multiple times, Your Honor. Yes, there is a level of speculation because, in theory, all priority dates could become current. October 1st, when new visas become available, everybody gets their green cards. Everybody's happy or can apply for their green cards, but the fact of the matter is that's not how our system works. They're highly likely. When you look at analysis from the Cato Institute, Indian nationals have a wait time of approximately 60 years to get a green card because of the backlogs, numbers, all that, and it's highly likely somebody's going to get promoted or change jobs within that time. So, yes, there is a level of speculation, Your Honor, but it's based in practicality. Thank you. Thank you, Counsel. At this time, would Counsel for the appellee please introduce themselves on the record to begin? May it please the Court, Brian Schaefer for the Department of Labor. Your Honors, the Court should dismiss this appeal as moot. Every perm application filed on behalf of the plaintiff's appellants and was subject to this lawsuit has been adjudicated by the Department of Labor. They were adjudicated in due course. The record kind of shows that. What I mean by that is the record indicates when they were filed, the date that they were filed. It also indicates when they were approved. Every month the Department of Labor publishes their processing times. These are absolutely in course and in the exact order with the Department of Labor processing time. These are in course of the exact order on which they filed. The government processed these in their due course. They were not processed for anything relative to this litigation. As noted, six of these were approved before the district court entered their summary judgment. As they were approved, the Department of Labor filed notices of administrative notice to let the court know as each of these were being approved, but six of these were approved before district court entered the summary judgment. I believe eight of the nine had been approved prior to the open and brief being filed in this case. I believe the ninth one was filed, I could be mistaken on the day, it was either the day of or the day before the open and brief was filed by appellant. Counsel, if we could just jump to the, let's assume we get beyond the mootness issue. Okay. Get to the merits and these track factors. Let me acknowledge that the district court wrote a very thoughtful decision here for sure, but its analysis of the rule of reason factor did bother me a bit because it seemed to amount to the proposition that if the government can explain the policy reasons for this dramatic departure from the first in, first out approach that it had announced sometime before, if it can explain why it made the change, and it seems to make sense, that that ability to explain why it made the change, that constitutes a rule of reason. That seems much too easy a standard for the government to meet. All we have to do is explain why we did it, and that's a rule of reason. How do you, if that's a fair characterization of what the district court said, how do you defend that? Two points, Your Honor. First, the rule of reason is the process that they use, meaning they have a rule that they're following, and that's, I think, what the district court was getting at. As far as the difference between the month processing rule that they use and the first in, first out, not to get too much into the data and the details, but a straight first in, first out would essentially mean that you have all these adjudicators and none of them can issue a decision until the first one that came in could be issued. So that's obviously not what first in, first out means, and what the Department of Labor has done to adjudicate these in order that they arrive, which is how the month processing rule works, is they process them in month batches, but they're still coming in, and generally in a first out. It's not a straight first in, first out, but as I was just explaining, like that's almost impossible when you have multiple adjudicators with thousands and thousands of applications. The month processing rule is it's not really a departure from the first in, first out. It's essentially a way of implementing that they're going in order that they're being received. And I say in order, but by a month. This departure has resulted in a huge wait time from the aspiration that was set forth initially of 45 to 60 days. Now we're talking, what, a year, a year plus to get this done. I don't think the departure led to, or as we call it, the change into month processing didn't lead to the delays. The influx of the number of applications to receive, meaning when they initially said, when you talked about 2004, they were anticipating a certain number of applications, and that number is significantly higher than what they have. So that's what led to, again, getting away from the 60 days when they realized it wasn't, it couldn't be done essentially based on the resources that they had. In the government's view, what is the potential legal relevance of the aspirational goal, I think is how you described it in your brief, that it would be around 60 days, because it wasn't a timeline set by Congress. It's not even in a regulation according to you, correct? It was just sort of prefatory language about what we hope to do. So how do we assess that in a case like this, because the wait times have ballooned to far, far more than what was anticipated, but yet it wasn't a regulation or a statutory obligation. So how should we weigh it when we're doing the analysis? In terms of weighing and analysis, I don't think it comes into any of the track factors. I think the language of the aspirational goal was, in a way, trying to be transparent with what the process is when the government is saying, we have this process, this is how we're going to process perm applications, and this is what we anticipate. I don't think it comes into any of the effect because it's not a congressional mandate. It's not, you know, it's, again, they were dealing with the data they had at that moment based on the number of applications they anticipated, and the number of applications significantly increased. So you think it's just completely irrelevant when the government is so off in the prediction of how long. I wouldn't say it's irrelevant. I think it, again, it's an aspirational goal, and there's plenty of cases where I'm saying that aspirational goals are not a factor on a track analysis. If I can turn back just quickly to the mootness point, I just want to point out that the speculation about these future events is, you know, that would go against First Circuit precedent in Harris. In that case, it was a student enrolled at a university, and he wanted a declaratory judgment about policies at the university, and he was no longer a student, and the court found that it had been mooted out, and his argument was that I could go back to school there, so therefore the case isn't moot, and the court held that you can't speculate about future events. So the idea that they would file future applications, it's completely speculative. Is it speculative in the same way counsel is in that case? Because what your opposing counsel has said is that even if you get a promotion from the same employer, if your responsibilities change at all, you would have to re-go through this process. What's your position? Is that just zeroing in on that specific issue? Is that true, that just an addition of one or two responsibilities would require somebody to go through this process again? It is true that they file a new PERM application, but what is not being included in that is the visas are tied to what's called a priority date, and a priority date is when a person can get a visa based on the number of visas Congress gets. The priority date would stay the same, and so his description of 60 years is, you know, that's the number of visas that Congress decides to give in certain categories, and there's a cap per country, and, again, there's analysis that try to predict how long that's going to take. Does that mean that you're saying that that just increases the likelihood that they'd get the visa before they had the job duties change? What's the relevance of this point? Judge Rickleman is asking you about what's the likelihood they'd have to submit a new PERM application, and her suggestion was it's relatively higher than the student case, because if job duties change over the course of their employment, they have to get a new PERM application. You say yes. What is the relevance of the visa point you're making? Oh, I'm pointing out that there's essentially not as much harm on the delay, meaning that, back to use the 60 years, is if we're talking about 60 years in the future and it takes immigration a year to adjudicate that, it's not going to have any impact on the end result. Do you get what I'm saying? If the person, based on the priority date, and, again, I'm just using his analysis of 60 years, if he's not going to ultimately get the visa for 60 years, if immigration takes a year to adjudicate, again, we're just talking about one step within the process, that's not going to create any harm on the adjudication. What's the relevance of that to the mootness question of whether the same issue is going to recur again in a short period of time? I'm sorry, I apologize. I would say to the mootness thing, it's still speculative. And students often go back to college. Many things in the future that are going to occur, I think this was your opponent's point, there's some degree of speculation about a future event. It's a contingency. We don't know what will happen. How likely is it to happen? The more likely it is to happen, the more likely it is that they can get advantage of this exception to mootness doctrine. For it to happen, it requires a new job, a new employer deciding to issue a new job, a new employer. Is that right? Or why isn't the same employer just giving new job duties to the same employee? It would be an employer deciding to file another petition. The beneficiary can't institute the process. So we're not only speculating about them needing a job, we're speculating about a third party deciding to create a new application. But would the employer be required under the government's regulations to file a new application if an employee is given a new position that includes new responsibilities? That was my factual question to you. Are they required to do it? I understand maybe they don't always, but under the law, should the employer have to file? To use the word required, they would be required to file a new application if the beneficiary intends to use the visa, meaning the employer could theoretically decide, you know, we filed a visa application under that previous position, but we don't want to file another one under a new one. I can't speculate as to what an employer would want to do, but they would have to for a beneficiary to adjust status or get a visa based on the perm application. They'd have to file a new application if the job duty is changed. The employer would have to, yes, for the employee to get a benefit from it. No further questions? No. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce themselves on the record? You have a two-minute rebuttal. Steven Brown for the appellants. Just a couple of quick points here on rebuttal. Number one, with the idea of the influx of applications, in the 2004 notice and comment, Department of Labor anticipated 100,000 applications, and while there has been some increase in previous fiscal years, last fiscal year there was about 92,259 perm applications filed, and we are still seeing now a tenfold increase of the aspirational or whatever, you know, it wants to be called goal that Department of Labor set for itself. So even in the years where there was an increase, let's say 120,000, maybe a 20% increase would be reasonable given the circumstances. The other is I don't believe this is like Harris. These individuals are no longer non-immigrants. They are still non-immigrants seeking an employment-based green card, and I can give an example. In 2020, because of the beginning of fiscal year 2021, there was massive progression in the visa bulletin because of COVID shutting down consulates abroad, slowing things down, allowing, you know, further processing. Individuals that have been stuck filing and waiting for their perm were not able to apply for immigrant visas before it retrogressed or during that immediate timeline because they were waiting for this process to take effect. Before you sit down on mootness, I know in your reply you make the argument about voluntary cessation. Did you make a capable of repetition argument? I can't remember off the top. I believe we did, Your Honor, but I can't remember off the top of my head, Your Honor. I'm just not seeing it, but maybe you did. Then I do think, you know, I do think it is capable of repetition, but with the voluntary cessation as well, Your Honor. Okay, thank you. Ten seconds, go ahead. I'm sorry. Well, one final point, Your Honor. I would just encourage the court in terms of the merits, if we get to that point, to follow the Sixth Circuit with regards to the processing time and argue with the Berrios-Garcia example of, you know, not comparing snails against snails in a snail's race when all processing could be unreasonable. Thank you, Your Honor. Thank you. Thank you. That concludes argument in this case.